# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# SHERMAN DIVISION

| | |
|---|---|
| VICENTA VEGA | § |
| | § |
| v. | §    NO. 4:24-CV-00733-SDJ-BD |
| | § |
| ROSS STORES INC. | § |

## MEMORANDUM OPINION AND ORDER

Plaintiff Vicenta Vega moved to strike defendant Ross Stores, Inc.'s designation of expert witness Patrice Morin-Resch. Dkt. 47; *see* Dkts. 48 (response), 49 (brief in support of response). The motion will be denied.

## BACKGROUND

According to the operative complaint, Vega was injured when she slipped on water that had accumulated on the floor of a Ross Stores retail store. Dkt. 41. She seeks damages for past and future medical expenses, past and future pain and suffering, past and future physical impairment, past and future scarring and disfigurement, and lost earning capacity. *Id.* at 4–5.

Ross Stores designated Morin-Resch as an expert witness. *See* Dkts. 44 (notice of designation), 49-1 (Morin-Resch's curriculum vitae), 49-2 (affidavit and expert report). Morin-Resch has authored textbooks on medical billing and coding, edited the American Medical Association's CPT® (Current Procedural Terminology) codebook, and trained thousands of people on the use of CPT® coding. Dkt. 49-1. Her report provides "charge benchmark data," which she describes as "actual medians of 'charges' that doctors and other medical providers have submitted to third-party payers and shows how these compare to what the providers have invoiced to the plaintiff." *Id.* at 4. She explains that she uses "Context 4 Healthcare data to compare charges made by physicians, chiropractors, outpatient facilities, and hospitals" and that, for medications, she uses GoodRx or Drugs.com. *Id.* at 5–6. The Context 4 Healthcare data comes "from various clearinghouses that collect the charge information after it is sent from the provider before it is dispatched to a third-party payer," and Morin-Resch narrows the data by service date, zip code,

and medical code. *Id.* at 6. She explains that her "work is *not* limited to merely uploading the Context 4 Healthcare comparative fees into a spreadsheet"; she analyzes and compares the billing codes used in medical documentation to determine whether they are correct. *Id.* at 6–7. She provides a report that reflects different percentiles showing how much medical providers billed for the same service in the same year and geographic location. *Id.* at 9. As she explains, 50 percent of providers charge equal to or less than the 50th-percentile dollar amount; 60 percent of providers charge equal to or less than the 60th-percentile dollar amount, and so on. *Id.* The report also includes the amount that Medicare pays for those services.

The report includes Morin-Resch's opinion as to whether the amounts billed by twelve of Vega's providers were usual, customary, and reasonable when compared with the data compiled from Context 4 Healthcare, Medicare, GoodRx, and Drugs.com. *Id.* at 10–46.

## LAW

Federal Rule of Evidence 702 governs the admissibility of expert testimony. It was amended a couple of years ago to provide:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

The 2023 advisory committee note explains that the amendment was meant to (1) "clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule" and (2) "emphasize that each expert opinion must stay within the bounds of what can be concluded from a reliable application of the expert's basis and methodology."

In *Daubert v. Merrell Dow Pharmaceuticals*, the Supreme Court instructed courts to serve as gatekeepers when applying Rule 702 to determine whether expert testimony should be presented to the jury. 509 U.S. 579, 589–95 (1993). Courts must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). That "gate-keeping obligation applies to all types of expert testimony, not just scientific testimony." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002).

Under the *Daubert* test, which examines the underlying theory on which an expert opinion is based, "[t]he proponent need not prove to the judge that the expert's testimony is correct, but she must prove by a preponderance of the evidence that the testimony is reliable." *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 276 (5th Cir. 1998). The court's inquiry is flexible, in that "[t]he relevance and reliability of expert testimony turns upon its nature and the purpose for which its proponent offers it." *United States v. Valencia*, 600 F.3d 389, 424 (5th Cir. 2010).

The Fifth Circuit explained several decades ago that, "[a]s a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the [factfinder's] consideration." *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987). And although the 2023 advisory committee note to Rule 702 criticized unspecified judicial decisions concluding that "critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility," it also acknowledged that "[s]ome challenges to expert testimony will raise matters of weight rather than admissibility even under the [Federal] Rule 104(a) standard," which is less permissive than Rule 104(b). *Compare* Fed. R. Evid. 104(a) (providing that "[t]he court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible") *with id.* R. 104(b) (providing that "[w]hen the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist" and that "[t]he court may admit the proposed evidence on the condition that the proof be

3

introduced later"). In other words, "once the court has found it more likely than not that the admissibility requirement has been met, any attack by the opponent will go only to the weight of the evidence." Fed. R. Evid. 702, advisory cmte. n. to 2023 amendment.

It remains the case that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596; *see also Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004) (explaining that, "[a]lthough the *Daubert* analysis is applied to ensure expert witnesses have employed reliable principles and methods in reaching their conclusions, the test does *not* judge the expert conclusions themselves"). Although "the district court must act as a gatekeeper to exclude all irrelevant and unreliable expert testimony, 'the rejection of expert testimony is the exception rather than the rule.'" *Puga v. RCX Sols., Inc.*, 922 F.3d 285, 294 (5th Cir. 2019) (quoting Fed. R. Evid. 702 advisory cmte. n. to 2000 amendment). It remains "the role of the adversarial system, not the court, to highlight weak evidence." *Primrose Operating Co. v. Nat'l Am. Ins.*, 382 F.3d 546, 562 (5th Cir. 2004).

## DISCUSSION

Vega argues that Morin-Resch's proposed testimony is irrelevant and based on unreliable data and methodology because it relies on data from Context 4 Healthcare, Inc., Medicare, GoodRx, and Drugs.com and applies a percentile-based methodology to determine the reasonableness of charges. In response, Ross Stores argues that the data supporting Morin-Resch's proposed testimony is relevant and reliable and that her methodology reflects her knowledge and expertise. Although Ross Stores spends much of its response reiterating Morin-Resch's qualifications as an expert, Vega does not challenge her proposed testimony on that basis.

Morin-Resch's proposed testimony is both relevant and reliable. Any dispute about what weight it should be given is for the jury to decide.

### A. Relevance

Under Texas law, which applies in this diversity case, a plaintiff can recover only those medical expenses that were "actually paid or incurred." Tex. Civ. Prac. & Rem. Code § 41.0105. But the

4

common law further limits a plaintiff's recovery to expenses that are reasonable, even if the plaintiff was charged or obligated to pay a higher amount. *In re K & L Auto Crushers, LLC*, 627 S.W.3d 239, 249–50 (Tex. 2021). For that reason, "the negotiated rates the providers charged to private insurers and public payors for the medical services and devices provided to [the plaintiff], and the costs the providers incurred to provide those services and devices," are relevant to determining whether the amount actually charged is reasonable. *Id.* at 251; *see Gasperini v. Ctr. for Humans., Inc.*, 518 U.S. 415, 427 (1996) (explaining that, under the doctrine of *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938), federal courts sitting in diversity apply state substantive law and federal procedural law); *Chavez v. Dolgencorp of Tex., Inc.*, No. 7:22-CV-00199, 2023 WL 4679004, at *3 (S.D. Tex. July 21, 2023) (noting that *K & L Auto Crushers* "overruled the Fifth Circuit's '*Erie* guess' arriving at the opposite conclusion" in *Guzman v. Jones*, 804 F.3d 707, 712 (5th Cir. 2015) (italics added)).

Vega argues that Morin-Resch's opinion, which relies on data from Context 4 Healthcare, Medicare, GoodRx, and Drugs.com, is not relevant because Ross Stores cannot show that Vega had access to services or medications at those prices or that prices available through discount programs are the "benchmark" for reasonableness. Dkt. 47 at 6. Vega specifically asserts that she was not eligible for Medicare and that she did not have a Drugs.com discount card. Ross Stores argues that the price a provider would accept, even if it reflects a discount for a program like Medicare or Drugs.com, is "relevant to the holistic determination of what is usual, reasonable, and customary." Dkt. 49 at 7.

Morin-Resch's opinion about the reasonableness of charges, based on aggregated data from Context 4 Healthcare, Medicare, Drugs.com, and GoodRx and combined with her own knowledge of billing practices, is relevant to the amount Vega may recover for her medical expenses. *See K & L Auto Crushers*, 627 S.W.3d at 251. That is true even if Vega personally could not access services or medications at the prices charged to other customers. *See In re N. Cypress Med. Ctr. Operating Co.*, 559 S.W.3d 128, 133 (Tex. 2018) (explaining that the amounts reimbursed by third-party payors

5

for services to insured patients are relevant to determining the reasonableness of prices charged to uninsured patients).

### B. Reliability

Vega argues that Ross Stores cannot show that Morin-Resch reviewed the data underlying the Context 4 Healthcare reports or that the data has been peer-reviewed or relied on by others to establish usual, customary, and reasonable charges for medical care. Ross Stores argues that Morin-Resch reviewed the Context 4 Healthcare data to prepare her report and that its data has been used by hundreds of healthcare organizations over the course of decades.

Morin-Resch's report confirms that she reviewed the report provided by Context 4 Healthcare. Dkt. 49-2 at 5–6. Whether she reviewed the data underlying that report is not determinative of whether her testimony based on the report is reliable. *See Bailey v. Comcast of La./Miss./Tex., LLC*, 671 F. Supp. 3d 730, 734 (S.D. Miss. 2023) (in rejecting a reliability objection to an expert's use of a similar database, noting that "[i]n formulating opinions, experts routinely rely on reports or studies generated by others," calling the practice "entirely commonplace"); *Perez v. Boecken*, No. SA-19-CV-00375-XR, 2020 WL 3074420, at *11 (W.D. Tex. June 10, 2020) (rejecting a plaintiff's reliability objection that the expert "ha[d] no idea how billing data is submitted to [Context 4 Healthcare], and 'cannot personally vouch for the accuracy of the raw data collected and entered'"). Other courts have found that expert opinions relying on Context 4 Healthcare data were reliable. *See Perez*, 2020 WL 3074420; *Saldana v. Selvera*, No. 1:21-CV-00144, 2023 WL 3695620, at *1 (S.D. Tex. Mar. 8, 2023).

### C. Methodology

Vega challenges the methodology by which Morin-Resch reached her opinion. Specifically, Vega argues that Morin-Resch "utilize[d] no methodology" and "merely recite[d] percentiles a jury could read for themselves." Dkt. 47 at 5. She challenges Morin-Resch's conclusion that charges exceeding the 80th percentile are not reasonable because, in her view, there is an insufficient basis to draw the line between reasonable and unreasonable at 80%.

6

Ross Stores argues that Vega mischaracterizes Morin-Resch's opinion and overlooks the value added by her expert analysis. It points to Morin-Resch's assessments of the billing codes used by Vega's medical providers, which allowed her to provide additional commentary on how those providers billed. It also notes that Morin-Resch did not reach a blanket conclusion that bills were unreasonable because they exceeded the 80th percentile; instead, she discussed each service billed and compared it to the percentiles, noting that one provider billed 2.33 times the 80th percentile for similar services.

Morin-Resch's report supports Ross Stores's position. Morin-Resch's methodology entailed downloading data from Context 4 Healthcare; filtering it by date, location, and billing code; and extrapolating percentiles from the results. Morin-Resch then analyzed the billing codes used by Vega's providers, compared them to documentation showing the care Vega actually received, and made corrections as necessary to the billing codes that should have been applied. Morin-Resch then compared the prices charged to Vega with prices charged for the same services, as reflected by the Context 4 Healthcare data. Vega may be able to criticize the report when it is presented to the jury, but she cannot show that Morin-Resch employed "no methodology." Dkt. 47 at 5.

*Daubert*'s "general acceptance" factor goes to whether a theory or technique is reliable. 509 U.S. at 594. "A proponent need not prove to the judge that the expert's testimony is correct," but only that it is based on reliable methods. *Moore*, 151 F.3d at 276. That means it does not matter, at this stage, whether Morin-Resch is correct that a given charge for a medical service is unreasonable. What matters is how she reached that conclusion, and her report makes that sufficiently clear. Again, if Vega disagrees with Morin-Resch, she may try to convince the jury of her view through cross-examination.

## CONCLUSION

It is **ORDERED** that Vega's motion to strike, Dkt. 47, is **DENIED**.

7

So **ORDERED** and **SIGNED** this 8th day of September, 2025.

                                                                                     Bill Davis
                                                                                     United States Magistrate Judge